# EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| Paul M. Cruz | N/A | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**    IN CHAMBERS ORDER Re MOTION for Partial Summary Judgment [77]

## I.    INTRODUCTION

On July 11, 2011, Plaintiff Ventura Content, Ltd. ("Plaintiff") filed its complaint in this Court against Defendants Motherless, Inc. ("Motherless"), a New York Corporation, and Motherless' President Joshua Lange (together, "Defendants"). See Complaint ("Compl.") (Dckt. 1). Plaintiff asserted two claims against Defendants: one for direct, vicarious, and contributory copyright infringement, and another for violations of unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code § 17200.

Defendants brought the instant motion for summary judgment as to Plaintiff's copyright claims, arguing first that they had not infringed on Plaintiff's copyrights, and second, that even if they had, they were entitled to the "safe harbor defense" of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. For the reasons put forward in this Order, the Court finds that Defendants are entitled to Section 512's safe harbor, and thus GRANTS Defendants' motion for summary judgment on that basis.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

## II.    FACTUAL BACKGROUND[1]

Motherless owns and operates a website named "Motherless.com." SUF ¶¶ 8-11.[2] Motherless allows its users to upload pictures and videos onto Motherless.com; once this material has been uploaded onto Motherless.com, other users are permitted to view them. SUF ¶ 12. The pictures and videos are stored on servers owned by Lange, in a facility rented by Motherless, in Texas. SUF ¶ 41.[3] The vast majority of content available at Motherless.com—between 85 and 90%—depicts sexually explicit content. SUF ¶ 14. Any individual is permitted to become a user, and may upload and view content as he or she wishes. SUF ¶¶ 44-48. Presently, Motherless.com has approximately 728,269 active users. SUF ¶ 70.

Before uploading any content, a user must agree to Motherless.com's procedures and policies as set forth on its "Terms of Use" page. SUF ¶ 51, 67. Among other things, the Terms of Use requires users to affirm that they have "won or have the necessary licenses, rights, consents, and permission to use and authorize [Motherless] to use all . . . copyright . . . rights." SUF ¶ 72. It further provided that users agree not to "post, or otherwise distribute or facilitate distribution of any content that . . . . infringes on any copyright right of any party." Id. The Terms of Use further informs users that Motherless will remove content that it deems to be illegal, include material that infringes on copyright. Id.

Motherless employs its own review process designed to ensure that uploaded content does not violate its terms of use. SUF ¶¶ 92-99. Motherless' review process uses a computer software to generate "thumbnails"—a two-inch by two-inch image of the material displayed—of each item of content uploaded. SUF ¶¶ 92-94. For every picture uploaded, a single thumbnail is created. SUF ¶ 93. For each video uploaded, Motherless' software creates five (5) thumbnails, one displaying the image contained at the "20 percent" point (that is, the image that appears one-fifth of the way into the video);

---

[1] This factual background includes only general facts as to the operation of the website and the activities giving rise to Plaintiff's causes of action. Other facts—particularly those relevant to Defendants' DMCA affirmative defense—are set forth below as needed.

[2] Lange is the sole shareholder and director of Motherless. SUF ¶ 3.

[3] Motherless.com functions similar to YouTube: it permits users to "upload" and view video clips and pictures. See Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 28 (2d Cir. 2012) ("The basic function of the YouTube website permits users to 'upload' and view video clips free of charge.").

|  |  | : |
|---|---|---|
| | Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |
|---|---|---|---|

the next at the "40 percent" point ; and the final three at the sixty, eighty, and 100 percent points.  SUF ¶ 94.  Within two to four days of a user uploading a video or picture, a Motherless employee or representative briefly reviews each thumbnail for "obvious signs of child pornography, copyright notices, watermarks, and any other information that would indicate that the picture or video contains illegal content or violates" the Terms of Use, and deletes any material that does so.  SUF ¶ 96.  Defendants do not select the thumbnails to view, and they do not see any other portion of the video.  SUF ¶ 94.

When a user uploads content, he or she has the option of adding a title and tying the content to a particular "group."  SUF ¶¶ 83-84.  "Groups" are user-created categories that make it easier for other users to search for particular content.  SUF ¶ 362.  Thus, for example, a user might create a group named "Blondes," and "tie" a video featuring blonde performers to that group.  SUF ¶ 358.  This allows future users to search for, and quickly locate, the desired content.  Id.  At least some of these groups are named for professional porn stars, celebrities, or copyright-protected movies or shows.  SUF ¶ 365.  In order for users to create a group, they must get approval from Defendants; moreover, Defendants remove unpopular groups or ones that violates their Terms of Use.  SUF ¶¶ 363-364.  Motherless also has an "awards" program, through which it recognizes the user who uploads the most viewed content, or who uploads the most content.  SUF ¶¶ 196-197.  Motherless also selects certain content to be "prominently featured" on the website.  SUF ¶¶ 372.

Plaintiff is a leading distributor of sexually explicit films.  SUF ¶ 20.  Between May 2006 and March 2010, Plaintiff produced, and obtained copyright registrations, for the nineteen films at issue in this case.  SUF ¶ 21.  Between December 200 and July 2011, eight Motherless.com users uploaded various portions of these nineteen films—thirty three clips in total—onto Motherless.com.  SUF ¶ 22.  None of the thirty-three clips contained any indication that Plaintiff was the copyright owner; however, three of the clips contained a watermark, "videosz.com" and one contained the watermark "monstercockbabes.com".  SUF ¶¶ 276-279.  Neither watermark has any connection to Plaintiff.  SUF ¶¶ 277.  Before Plaintiff filed the instant suit on July 19, 2011, Plaintiff had made no effort to inform Defendants that the thirty-three clips contained copyrighted material.  SUF ¶ 300.  On November 23, 2011, Plaintiff provided Defendants with the URLs of the thirty-three videos at issue; on the same day, Defendants deleted the videos from their content.  SUF ¶¶ 304-305.

## III.    LEGAL STANDARD

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tarin v.

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

Cnty. of L.A., 123 F.3d 1259, 1263 (9th Cir. 1997).  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  "A justifiable inference is not necessarily the most likely inference or the most persuasive inference.  Rather, an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is rational or reasonable."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (internal citation and quotation marks omitted).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The moving party may satisfy its Rule 56(c) burden by "'showing'—that is, pointing out to the district court —that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  See id. at 323-24; Anderson, 477 U.S. at 248.  A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.  Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000).  Only genuine disputes over facts that might affect the outcome of the suit under the governing law —i.e., "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party"—will properly preclude the entry of summary judgment.  See Anderson, 477 U.S. at 248.

Under Local Rules 56-2 and 56-3, these triable issues of fact must be identified in the non-moving party's "Statement of Genuine Issues" and supported by "declaration or other written evidence."  See also Sullivan v. Dollar Tree Stores, Inc., 623 F.3d 770, 779 (9th Cir. 2010) ("Federal Rule of Civil Procedure 56(e)(2) requires a party to 'set out specific facts showing a genuine issue for trial.'") (emphasis in original).  If the non-moving party fails to identify the triable issues of fact, the court may treat the moving party's evidence as uncontroverted, so long as the facts are "adequately supported" by the moving party.  Local Rule 56-3; see also Int'l Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 398 n.14 (1986) ("[I]t is not [the Court's] task sua sponte to search the record for evidence to support the [parties'] claim[s].");  Carmen v. San Francisco United Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read.  It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence.").

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|
| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

### IV.    PLAINTIFF'S PRIMA FACIE CASE

In its complaint, Plaintiff asserted three federal causes of action: direct, contributory, and vicarious copyright infringement. See Compl. ¶¶ 42-51. Defendants move for summary judgment on the grounds that Plaintiff cannot, as a matter of law, establish a prima facie case as to each cause of action.

In order to make out a prima facie case of direct copyright infringement under 17 U.S.C. § 106, Plaintiff must satisfy two elements: first, it must show that it owns the copyright of the allegedly infringed material; and second, it must demonstrate that Defendants reproduced, prepared derivative works from, distributed, performed, or displayed a copyrighted work without its authority. See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1159 (9th Cir. 2007) ("Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.") (internal citations and quotation marks omitted).

It is undisputed that Plaintiff owns the copyright of the thirty-three clips at issue in this case. Moreover, by allowing users to upload the infringing videos onto its website, and subsequently allowing other users to access and view those stored images, Defendants infringed upon Plaintiff's exclusive right to "display" them. See Amazon.com, 508 F.3d at 1160 (holding that a service provider infringed upon a copyright holder's exclusive right to display its works because it was undisputed that the service provider's "computers store thumbnail versions of [the copyright holder's] copyrighted images and communicate copies of those thumbnails to [the service provider's] users."). At a minimum, Plaintiff has made out a prima facie case of direct copyright infringement. Because Defendants' safe harbor defense applies equally to each of Plaintiff's three claims, the Court need not decide whether Plaintiff would also be able to make out a prima facie case of vicarious and/or contributory liability.

### V.    DEFENDANTS' SAFE HARBOR DEFENSE

#### A.    Legal Background

"Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the ["DMCA"], the Online Copyright Infringement Liability Limitation Act (OCILLA). 17 U.S.C. § 512 (2003)." Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). While recognizing that "'in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability[,]'" Congress was nonetheless "loath

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions." UMG Recordings, Inc. v. Shelter Capital Partners LLC, ___ F.3d ___, No. 09-55902, 2013 WL 1092793, at *5 (9th Cir. Mar. 14, 2013) (quoting S. Rep. No. 105-190, at 8 (1998) (alteration omitted)). In an effort to balance these competing concerns, Congress designed the OCILLA to "facilitate cooperation among Internet service providers and copyright owners 'to detect and deal with copyright infringements that take place in the digital networked environment.'" Ellison, 357 F.3d at 1076 (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551, pt. 2, at 49 (1998)).

The two principal features of the DMCA, as amended by the OCILLA, reflect this balance. First, the DMCA created a "notice and takedown protocol," through which a copyright owner who suspects that his or her copyright is being infringed may notify the service provider of potential infringing activity occurring on its network. See Rossi v. Motion Picture Ass'n of Am. Inc., 391 F.3d 1000, 1003 (9th Cir. 2004) ("When a copyright owner suspects his copyright is being infringed, he must follow the notice and takedown provisions set forth in § 512(c)(3) of the DMCA[.]"). The DMCA provides detailed specifications of what a copyright holder must include in its notice to the service provider. See 17 U.S.C. § 512(c)(3). Once a service provider receives a notice of copyright infringement that conforms to the statutory requirements detailed in Section 512(c)(3) (a "DMCA-compliant notice"), a service provider "must 'respond expeditiously to remove, or disable access to, the material that is claimed to be infringing.'" Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004) (quoting Recording Industry Ass'n of America v. Verizon Internet Servs., 351 F.3d 1229, 1234 (D.C. Cir. 2003) (alteration omitted)). A service provider that fails to take down properly-noticed material exposes itself to copyright liability. Corbis, 351 F. Supp. 2d at 1098. As this notice and takedown regime makes apparent, "a service provider need not affirmatively police its users for evidence of repeat infringement." Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1111 (9th Cir. 2007). Instead, as the Ninth Circuit observed, Congress made a "considered policy determination" to "place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." UMG Recordings, 2013 WL 1092793, at *11.

The second pillar of the DMCA provides "four safe harbors that preclude imposing monetary liability on service providers for copyright infringement that occurs as a result of specified activities." UMG Recordings, 2013 WL 1092793, at *5. These safe harbors are detailed in Section 512(a) through 512(d). See 17 U.S.C. §§ 512(a)-(d). Although the safe harbors "do not render a service provider immune from copyright infringement," they do "protect eligible service providers from all monetary and most equitable relief that may arise from copyright liability." Corbis, 351 F. Supp. 2d at 1098-99. "Thus, even if a plaintiff can show that a safe harbor-eligible service provider has violated her copyright,

:

Initials of Preparer                 PMC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | | Date | July 3, 2013 |
|---|---|---|---|---|
| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | | |

the plaintiff will only be entitled to the limited injunctive relief set forth in 17 U.S.C. § 512(j)." Id. at 1099. Here, Defendants assert they are entitled to the safe harbor protection detailed in Section 512(c).

### B. Section 512(c)

"There are a number of requirements that must be met for a 'service provider' like [Defendants] to receive § 512(c) safe harbor protection." UMG Recordings, 2013 WL 1092793, at *5.[4] Section 512(c) provides, in relevant part:

(c) Information residing on systems or networks at direction of users.—

(1)     In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

---

[4] The Court assumes, without deciding, that Motherless is a service provider within the meaning of Section 512(c), because Plaintiff has not contended otherwise. Other courts have found companies that provide services similar to that Motherless operates to be service providers within the meaning of Section 512(c). See YouTube, 676 F.3d at 30 (applying Section 512(c) to claims of copyright infringement against YouTube); see also UMG Recordings, 2013 WL 1092793, at *5 n.4 (assuming, without deciding that the owners of a publicly accessible website that allows users to view videos uploaded by other users was a service provider under Section 512(c)).

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in [Section 512(c)(3)], responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c). Moreover, to be eligible for Section 512(c)'s safe harbor, the service provider must designate an agent to receive DMCA-compliant notices sent by copyright holders. See 17 U.S.C. § 512(c)(2). Finally, the service provider "must meet the threshold conditions set out in [17 U.S.C.] § 512(i)[.]" CCBill, 488 F.3d at 1109. Section 512(i) requires a service provide to "adopt and reasonably implement" a repeat-infringer policy, and prohibits service providers for interfering with "standard technical measures" as defined in the statute. 17 U.S.C. §§ 512(i)(1)(A)-(B).

Plaintiff contends that four of these requirements have not been met by Defendants. First, Plaintiff argues that genuine issues of fact remain as to the "knowledge" and "expeditious take down" requirements of Section 512(c)(1)(A). Second, Plaintiff argues that infringement did not occur "by reason of the storage at the direction of a user." Third, Plaintiff argues that Defendants has the right and ability to control infringing activity, and receives a financial benefit directly attributable to, the infringing activity. Finally, Plaintiff argues that Defendants have not adopted and reasonably implemented a repeat-infringer policy as required by Section 512(i)(1)(A). The Court addresses each contention in turn.

## C.     Knowledge or Expeditious Take-Down

Section 512(c)'s protections apply only to service providers that "(i) do[] not have actual knowledge that the material or an activity using the material on the system or network is infringing;" "(ii) in the absence of such actual knowledge, [are] not aware of facts or circumstances from which infringing activity is apparent; or" "(iii) upon obtaining such knowledge or awareness, act[] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A). As the Ninth Circuit has explained, "to be coherent, the statute must be read to have an implicit 'and' between § 512(c)(1)(A)(i) and (ii)." UMG Recordings, 2013 WL 1092793, at *9 n.11. Thus, Section 512(c)'s protections apply only to those service providers that "either (1) have no actual knowledge *and* no awareness of facts or circumstances from which infringing activity is apparent *or* (2) expeditiously

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |
|---|---|---|---|

remove or disable access to infringing material of which it knows or is aware." Id. (internal quotation marks and alteration omitted).

    1.  Actual Knowledge

A copyright holder's decision to forgo the DMCA notice protocol "strip[s] it of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder." UMG Recordings, 2013 WL 1092793, at *10 (internal citations and quotation marks omitted). Moreover, the Ninth Circuit has rejected the contention that "actual knowledge" can be found if a service provider has a "general knowledge that its services could be used to post infringing material." Id. Instead, the record must reflect that a service provider has "specific knowledge of particular infringing activity." Id. at *11; see also A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1021 (9th Cir. 2001) ("[A]bsent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material.").

It is undisputed that, until it filed the instant action, Plaintiff did not notify Defendants that its copyrighted material was available on Defendants' system. SUF ¶¶ 306, 322-324. Plaintiff's failure to do so "stripped it of the most powerful evidence of a service provider's knowledge." Plaintiff has offered no other evidence that Defendant had "specific knowledge of particular infringing material." Moreover, it is undisputed that Defendants promptly removed the clips at issue in this suit from its website upon confirmation that they were infringing material. SUF ¶¶ 300-306. Thus, "there is no question on the record presented that [Defendants] lacked actual knowledge of the alleged infringing activity at issue." Io Group, Inc. v. Veoh Networks, Inc., 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008); see also id. (holding that defendant did not have actual knowledge of specific instances of infringement because it was "undisputed that, before it filed the instant action, plaintiff provided no notice to [the defendant service provider] of any claimed copyright infringement").

    2.  Awareness of Facts or Circumstances that Indicated from Which Infringing
        Activity is Apparent

Defendants must also not have been "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). Under this so-called "red flag test," the relevant inquiry is *not* whether the service provider *should* have known that the material was infringing, but whether the service provider "deliberately proceeded in the face of blatant factors of which it was aware." 3 DAVID NIMMER AND MELVILLE B. NIMMER, NIMMER ON COPYRIGHT § 12B.04[A][2] (Mathew Bender Rev. Ed., 2012); see also Io Group, 586 F. Supp. 2d at 1148 ("In other words, apparent

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|----------|----------------------|------|--------------|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|-------|--------------------------------------------------|

knowledge requires evidence that a service provider turned a blind eye to red flags of obvious infringement.") (internal citations and quotation marks omitted).  As the Ninth Circuit has explained

> "The difference between actual and red flag knowledge is . . . between a subjective and an objective standard. In other words, the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."

UMG Recordings, 2013 WL 1092793, at *15 (quoting Viacom Int'l v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir. 2012)).  Moreover, like the actual knowledge requirement, the red flag test applies "'only to specific instances of infringement.'"  UMG Recordings, 2013 WL 1092793, at *15 (quoting YouTube, 676 F.3d  at 31).  In other words, to find that a service provider was aware "of facts or circumstances from which infringing activity is apparent," the record must indicate that a service provider was subjectively aware of facts that would have made it objectively obvious to the service provider that the specific copyrights owned by the Plaintiff were being infringed.

The record here contains no such indication.  Plaintiff has failed to produce *any evidence whatsoever* from which it might be inferred that Defendants were aware of "facts or circumstances" indicating that the clips at issue in this suit infringed upon Plaintiffs' copyrights.  See CCBill, 488 F.3d at 1114 (holding that a service provider did not have red flag knowledge, despite the fact that it provided services to websites named "illegal.net" and "stolencelebritypics.com," reasoning that "when a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen"); cf. YouTube, 676 F.3d at 33-34 (holding that a report from a service provider's employee that stated that "as of today, episodes and clips of the following well-known shows can still be found on Youtube . . . . we would benefit from preemptively removing content that is *blatantly illegal and likely to attract criticism*" and an e-mail exchange in which an employee noted that "there is a cnn clip of the shuttle clip on the site today, if the boys from Turner would come to the site, they might be pissed?" to which the service provider's founder replied "we should just keep that stuff on the site.  I really don't see what will happen" raised a material issue of fact regarding the service provider's actual or red-flag knowledge) (emphasis added). [5]

---

[5] The Ninth Circuit has suggested—but not held—that a DMCA-compliant notification from a *third party* copyright holder might confer red flag knowledge upon a service provider.  See UMG Recordings, 2013 WL 1092793, at *14 n.14 (refusing to consider whether a service provider's apparent

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

3.  <u>Plaintiff's Remaining Arguments</u>

Plaintiff presents four arguments that it contends demonstrate that a genuine issue of material fact remains as to either Defendants' actual or red flag knowledge.  Each contention is without merit.

a.  *Defendants' Business Model is Reliant on "Mass Infringement"*

Plaintiff first attempts to elide the specific knowledge requirement by contending that Defendants "must" have known that infringing material had been uploaded onto their website because their business model is "reliant on mass infringement."  Plaintiff's argument is specifically tailored to the pornography industry: according to Plaintiffs, pornography-only websites like Motherless.com attract visitors by holding a large amount of free pornography.  Moreover, the only way to accumulate such large volumes of free pornography on its website is, according to Plaintiffs, to "get large volumes

---

infringement of a third party copyright holder's movies and television shows "would affect the availability of the § 512(c) safe harbor with regard to [the plaintiff's] claims that the [defendant service provider] hosted unauthorized [material]").  But see YouTube, 676 F.3d at 34 (suggesting that a service provider only falls outside of Section 512(c)'s safe harbor if it has actual or red-flag knowledge of the "clips-in-suit" of the litigation); see also 3 NIMMER ON COPYRIGHT § 12B.04[B][5] (noting that there is "reason to doubt" that "non-party notices can serve to sacrifice the Section 512(c) safe harbor for storing material" based on the Ninth Circuit's decision in <u>Perfect 10, Inc. v. CCBill LLC</u>).

Here, Plaintiff has identified three instances in which Defendants took between ten to fifteen days to remove copyrighted material identified by a third party copyright holder in what appears to be DMCA-complaint notification.  SUF ¶ 384.  Even assuming that such third party notices can be considered in evaluating whether a service provider had red flag knowledge, and that fifteen days is not "expeditious" within the meaning of the DMCA, these occasional lapses do not alter the Court's conclusion that Defendants are entitled to Section 512(c)'s safe harbor.  The undisputed facts demonstrate that Defendants expeditiously removed the vast majority of infringing material upon receiving DMCA-compliant (and non-DMCA-complaint) notices.  Defendants have received over 3,500 notices of infringement since Motherless.com began operating in 2008, and have removed all infringing material identified in those notices.  SUF ¶¶ 246, 264.  Moreover, Plaintiff does not dispute that, in all but three instances (or more that 99.99% of the time), Defendants expeditiously removed the material identified in these notices.  Defendants' occasional delay in removing material identified in DMCA-compliant notices does not create a genuine issue of material fact as to whether Defendants are entitled to Section 512(c)'s safe harbor.

|  | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

of professionally created-pornography." Furthermore, Plaintiff argues, the only way professionally-created pornography could end up on Motherless.com is via the upload of copyrighted material by users who are not authorized to do so, or via a business relationship with pornography producers who authorize the uploading of clips in exchange for banners advertising their content on the website—relationships that, Defendants admit, they do not have. Lane Decl. ¶¶ 93-95. Therefore, according to Plaintiff, Defendants "must" know that a substantial portion of the material uploaded is copyrighted.

Even crediting Plaintiff's chain of inferences as true, Plaintiff's argument is premised on a misunderstanding of the applicable test. As the above discussion makes clear, the Ninth Circuit has repeatedly held that a service provider falls outside of Section 512(c)'s safe harbor only if the record contains evidence that a service provider failed to expeditiously remove material once it gained actual or red flag knowledge of *specific instances of infringement*. For the reasons laid out above, there is no genuine dispute of material fact that Defendants expeditiously removed infringing material upon gaining actual or red flag knowledge of specific instances of infringement.

Moreover, Plaintiff's argument that Defendants "must" have known of infringing activity was specifically rejected by the district court in UMG Recordings. See UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009) aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC, 2013 WL 1092793 (9th Cir. Mar. 14, 2013) ("UMG nevertheless argues that Veoh is ineligible for the safe harbor because its founders, employees, and investors knew that widespread infringement was occurring on the Veoh system. *But even if this were true and undisputed, UMG cites no case holding that a provider's general awareness of infringement, without more, is enough to preclude application of section 512(c)*.") (emphasis added). As that Court observed,

> No doubt it is common knowledge that most websites that allow users to contribute material [that] contain infringing items. If such general awareness were enough to raise a "red flag," the DMCA safe harbor would not serve its purpose of "facilitating the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age," and "balancing the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet."

Id. (quoting S. Rep. 105-190, at 1-2 (1998); H.R. Rep. 105-551(II), at 21) (alterations omitted). Indeed, the service provider at issue in UMG Recordings sought to "build or create an audience" by having a "wide range of content on its system," 665 F. Supp. at 1102 (quotation marks omitted), but this business model alone was insufficient to avoid Section 512(c)'s safe harbor. Plaintiff's pornography-specific

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

argument is nothing more than a re-articulation of the argument rejected by both the district court and the Ninth Circuit in <u>UMG Recordings</u>.

The Court recognizes the intuitive appeal of Plaintiff's argument: unlike the service provider in <u>UMG Recordings</u>, Defendants have offered no evidence of content "subject to copyright protection but lawfully available" on its systems, such as videos "created by users [or] videos that [Defendants] provided pursuant to arrangements it reached with major copyright holders[.]" <u>UMG Recordings</u>, 2013 WL 1092793, at *10 (internal citations and quotation marks omitted). However, Section 512(c)'s safe harbor does not require Defendants to offer such evidence. It requires only that Defendants demonstrate the absence of a genuine issue of material fact as to whether they had actual or red flag knowledge of *specific instances of infringement*, which they have done here. To demand more would require Defendants to demonstrate that material on their website was *not* copyright-infringing, effectively undermining Congress' "considered policy determination" of placing the "burden of policing copyright infringement . . . squarely on the owners of the copyright." <u>Id.</u>, at *11; <u>see also</u> <u>id.</u>, at *10 ("[I]f merely hosting material that falls within a category of content capable of copyright protection, with the general knowledge that one's services could be used to share unauthorized copies of copyrighted material, was sufficient to impute knowledge to service providers, the § 512(c) safe harbor would be rendered a dead letter[.]");<u>YouTube</u>, 676 F.3d at 33 (holding that surveys estimating between fifty and eighty percent that YouTube streamed contained copyrighted material were "insufficient, standing alone, to create a triable issue of fact as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular instances of infringement"); <u>Tiffany (NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 110 (2d Cir. 2010) (holding that although a website "concede[d] that it knew as a general matter that counterfeit Tiffany products were listed and sold through its website[,]" such knowledge alone was insufficient to support a finding that the website had been willfully blind to specific instances of infringement).

Finally, the intuition upon which Plaintiff relies is not supported by the facts of this case. Despite ample opportunity for discovery, Plaintiff has identified, at most, three instances in which copyright-protected material remained on Defendants' servers for a period of more than a few days. <u>See</u> <u>supra</u> note 5. If Defendants' business model was truly "reliant" on *mass* infringement, Plaintiff should have been able to unearth a substantial amount of copyright-protected content that remained on Defendants' website well after Defendants received DMCA-compliant notices that the content had been copyrighted during discovery. They have not.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

b.    *Features of Motherless.com*

Plaintiff further argues that specific features of the Motherless.com website demonstrate that Defendants are inducing their users to upload infringing material.  Plaintiff focuses primarily on Motherless.com's "group" function.  According to Plaintiff, the groups named for professional porn stars, celebrities, or copyright-protected movies and shows "clearly encourage[] the uploading of infringing material."  However, the Ninth Circuit rejected almost the exact same argument in UMG Recordings.  There, the copyright holder argued that a service provider's actual or red flag knowledge of infringement could be found because the service provider allowed its users to "tag" uploaded content under a "music videos" category.  UMG Recordings, 2013 WL 1092793, at *12.  The Ninth Circuit found this evidence insufficient to support the inference that Defendant had actual or red flag knowledge of specific infringing activity.  Id.  Just as permitting users to "tag" their content to a group named "music videos" was insufficient to demonstrate actual or red flag knowledge in UMG Recordings, allowing users to "group" their content under the identified categories is insufficient to establish the required knowledge here.  Moreover, the mere fact that users created groups based on particular celebrities, porn stars, or copyright-protected movies or TV shows does not demonstrate that Defendants had actual or red flag knowledge of specific instances of infringing activity; as the Ninth Circuit reasoned in CCBill, "when a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen."  488 F.3d at 1114.  Indeed, Plaintiff has failed to offer evidence that the content tagged to a particular group actually displayed images of the celebrities, television shows, or porn stars for which the groups were named.[6]

---

[6] The Ninth Circuit's recent decision in Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020 (9th Cir. 2013), does not compel a different result.  In Fung, the copyright holder introduced a wealth of evidence that Fung had actively encouraged copyright infringement, "by urging his users to both upload and download *particular* copyrighted works, providing assistance to those seeking to watch copyrighted films, and helping his users burn copyrighted material onto DVDs."  Id. at 1043 (emphasis added).  Moreover, there was evidence that the defendant himself personally used the technology he provided to download infringing material.  Id.  Perhaps most importantly, the copyright holder in Fung identified *specific files* that the defendant had downloaded or helped others download that contained infringing material.  In contrast to the overwhelming evidence in Fung, Plaintiff here has produced no evidence that Defendants were aware of or should have been aware that the thirty-three clips *at issue in this suit* were copyrighted.

:

Initials of Preparer                    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

Nor do the other features of Motherless.com highlighted by Plaintiff demonstrate that Defendants had actual or red flag knowledge of specific instances of infringement. The fact that Defendants give out rewards to those users who upload the most content, or the most popular content, does not demonstrate that Defendants had actual or red flag knowledge of specific instances of infringement; instead, it proves only that Defendants are encouraging uploading. Similarly, the fact that Defendants place popular content where it is most likely to be seen, and choose certain content for prominent locations, demonstrates only that Defendants are attempting to increase their revenue, not that they knew that specific content highlighted was infringing.

c.     *The Professional Nature of the Content on Motherless.com*

Next, Plaintiff argues that the professional nature of the content on Motherless.com demonstrates that Defendants knew or were aware of specific instances of infringement. According to Plaintiff, adult tube sites like Motherless.com attract visitors because they hold large amounts of free pornography. SUF ¶ 352. In order to obtain such large volumes, tube cites rely on professionally created pornography—it is impossible to generate such large quantities by relying solely on amateur content, as few people are willing to record and publicly post their own sex acts. SUF ¶ 353. Even assuming this to be true, "the professionally created nature of submitted content [does not] constitute[] a per se 'red flag' of infringement sufficient to impute the requisite level of knowledge or awareness to" Defendants. Io Group, 586 F. Supp. 2d at 1132. Indeed, given the audio-visual equipment available to the general public today, "there may be little, if any, distinction between 'professional' and amateur productions." Id.

d.     *Defendants' Review Process*

Finally, Plaintiff argues that Defendants "must" have known that its users were uploading copyrighted material because Defendants' employees "review and approve all uploads," many of which contain "watermarks or other express indicia of ownership." As an initial matter, the Court is skeptical that actual or red flag knowledge can be gained merely by reviewing content uploaded onto a website *for the express purpose of determining whether such content is infringing*. Doing so would, in effect, penalize a service provider for taking measures designed to prevent copyright infringement. Furthermore, it would have the impermissible effect of shifting the burden of determining whether specific content was illegal onto the service provider, a consequence that runs directly counter to Congress's purpose in creating Section 512(c)'s safe harbor. See CCBill, 488 F.3d at 1114 ("We do not place the burden of determining *whether photographs are actually illegal* on a service provider.") (emphasis added); see also 17 U.S.C. § 512(m) (stating that a service provider need *not* monitor its service, nor "affirmatively seek[] facts indicating infringing activity," in order to receive Section

| | | : | |
|---|---|---|---|
| | Initials of Preparer | | PMC |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

512(c)'s harbor); <u>UMG Recordings</u>, 2013 WL 1092793, at * 11 ("Congress made a considered policy determination that the [Section 512(c)'s] notification procedures would place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright.  In parsing § 512(c)(3), we have declined to shift that substantial burden from the copyright owner to the provider.") (internal citations, quotation marks, and alterations omitted).

Even assuming that Defendants could glean actual or red flag knowledge of specific instances of infringement from their review process, the record contains no indication that Defendants did so in this case.  In support of their assertion that Defendants "must" have gained such knowledge from their review process, Plaintiff submitted a declaration from their expert, Frederick Lane, who reviewed 996 clips uploaded onto Motherless.com over an eleven-hour span in November of 2012.  According to Mr. Lane, 66.3% of these clips were "clearly watermarked or contained other information identifying the content producer," and an additional 20.3% of the clips were "professional[ly] produced or obviously proprietary."  Lane Decl. ¶ 93.  Moreover, it is undisputed that Defendants' employees review each picture and video uploaded onto Motherless.com for "obvious signs of child pornography, copyright notices, watermarks and any other information" that would indicate the content uploaded is illegal or otherwise violates Motherless.com's terms of use.  Thus, according to Plaintiff, Defendants must have seen these watermarks and other indicia of ownership, and allowed such material to remain on the website.

Plaintiff's reliance on Lane's survey is misplaced for three reasons.  First, Lane's survey occurred *as users were uploading clips*.  Lane Decl. ¶ 93.  However, it is undisputed that Defendants' employees do not review uploaded content until two to four days *after* a clip or picture has been uploaded.  SUF ¶ 96.  Plaintiff has offered *no* evidence that Defendants allowed clips or pictures that contained "watermarks or other express indicia of ownership" to remain on Motherless.com after reviewing those clips—indeed, Lane's study does not indicate how many of the 996 clips he viewed remained on the site after Defendants reviewed them

Moreover, Lane's study failed to specify *where* the "watermarks or other indicia of ownership" appeared on each clip.  This failure is fatal to Plaintiff's assertion that Defendants saw watermarks and allowed material to remain on Motherless.com, in light of the undisputed fact Defendants only reviewed thumbnails that captured the images displayed at various intervals in the clips.  See SUF ¶¶ 92-94.  Plaintiff has failed to demonstrate that the "watermarks or other indicia of ownership" appeared on the thumbnails Defendants reviewed, and thus has failed to demonstrate that Defendants were aware of, and chose to ignore, specific instances of infringement.  See Io Group, 586 F. Supp. 2d at 1132 ("Although

|  |  | : |  |
|---|---|---|---|
| | Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

one of the works did contain plaintiff's trademark several minutes into the clip, there is no evidence from which it can be inferred that Veoh was aware of, but chose to ignore, it.").

Finally, Lane does not identify what the "watermarks or other indicia of ownership" were, such that, had Defendants' reviewed the clips, and seen the watermarks, it would have been "apparent" that the material was infringing. For example, three of the thirty-three videos at issue in this suit contained the watermarks "videosz.com" and one contained a watermark "monstercockbabes.com," entities completely unrelated to Plaintiff. SUF ¶ 277. The watermarks on Plaintiff's clips—the only specific watermarks identified by Plaintiff[7]—did not make it "objectively obvious" to a reasonable person that Plaintiff owned the copyrights to the content at issue in this suit. See CCBill, 488 F.3d at 1114 (holding that a service provider did not have red flag knowledge, despite the fact that it provided services to websites named "illegal.net" and "stolencelebritypics.com," reasoning that "when a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen").

    4.  <u>Willful Blindness</u>

Finally, in evaluating the knowledge or expeditious take-down requirement of Section 512(c), the Ninth Circuit has held that a service provider may not "willfully bury its head in the sand to avoid obtaining" specific knowledge of infringing activity. UMG Recordings, 2013 WL 1092793, at *12. Although Plaintiff makes no argument that Defendants "willfully buried its head," the Court concludes that the record contains no evidence that Defendants acted in this manner. In this case, it is undisputed that Defendants has received over 3,500 take-down notices; and that in response to both complaint and non-compliant take down notices, Defendants automatically deletes the identified content. SUF ¶¶ 243, 246. Thus, as in UMG Recordings, "the evidence demonstrates that [Defendants] promptly removed infringing material when it became aware of specific instances of infringement." 2013 WL 1092793, at *12; see also Tiffany, 600 F.3d at 110 (holding that although a website "concede[d] that it knew as a general matter that counterfeit Tiffany products were listed and sold through its website[,]" such knowledge alone was insufficient to support a finding that the website had been willfully blind to specific instances of infringement).

---

[7] Lane's study did not provide the clips he reviewed, and thus the Court is unable to discern whether they contained watermarks whose content would make it "objectively obvious" that the content infringed upon copyrights.

                        :

Initials of Preparer          PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|----------|----------------------|------|--------------|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|-------|--------------------------------------------------|

**D.    Infringement occurred "by reason of the storage at the direction of a user"**

Section 512(c)'s protections apply only to service providers whose copyright infringement occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). Plaintiff argues that infringement occurs at *Defendants'*, rather than *users'*, direction, because Defendants encourage users to upload *infringing* material.[8]  In support of this contention, Plaintiff points to the same features of Motherless.com—the "Groups," the rewards program, and the placing of popular content in prominent locations on the website. Plaintiff's argument is nothing more than a repackaging of their actual and red flag knowledge argument: that, because of these features, Defendants "must" have known infringing material was being uploaded onto their website, and therefore infringement occurred at Defendants' "direction." As discussed above, these features demonstrate, at most, that Defendants encouraged their users to upload *material*. Plaintiff's contention that Defendants encouraged their users to upload *infringing* material finds no support in the record.

**E.    Right and Ability to Control**

In order to receive Section 512(c)'s protections, a service provider must not "receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Plaintiff contends that genuine issues of fact remain as to whether Defendants receive a "financial benefit directly attributable to the infringing activity" and as to whether Defendants have the "right and ability to control such activity." As the statute makes plain, these two elements are connected: a service provider need only demonstrate that they do not receive a financial benefit "directly attributable to the infringing activity" *if* they have the "right and ability to control such activity." Because there is no genuine issue of material fact that Defendants do *not* have the "right and ability to control" infringing activity on its system, the Court need not decide whether Defendants receive a financial benefit directly attributable to infringing activity.

A service provider does *not* have the "right and ability to control" infringing activity merely because it has the technological capacity to remove or block access to materials posted on its website or on its system; "something more" is required. UMG Recordings, 2013 WL 1092793, at *19. Specifically, "in order to have the 'right and ability to control,' the service provider must exert substantial influence on the activities of users." Id. (internal citations, quotation marks, and alteration omitted). "Substantial influence" may include "high levels of control over activities of users," or "purposeful conduct." Id.; see also YouTube, 676 F.3d at 38 (noting that a showing of purposeful,

---

[8] Plaintiff does not dispute that infringement occurred "by reason of storage" by users.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

culpable inducement of copyright infringement "might also rise to the level of control under Section 512(c)(1)(B)") (citing <u>Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 937) (2005); <u>Perfect 10, Inc. v. Cybernet Ventures, Inc.</u>, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002) (finding that a service provider had the right and ability to control where the service providers instituted a monitoring program through which users received "detailed instructions regard[ing] issues of layout, appearance, and content" and forbade certain types of content and refused access to users who failed to comply with its instructions).[9]

Here, the record lacks any evidence that Defendants exercised "substantial influence on the activities" of its users. At best, the facts here demonstrate that the infringing material resided on Defendants' system and Defendants had the physical ability to remove the content. Plaintiff has failed to identify any other evidence raising a genuine issue of material fact as to whether Defendants exerted "substantial influence on the activities of its users." The Ninth Circuit held similar allegations insufficient to support a finding that a service provider had the "right and ability to control" infringing activity in <u>UMG Recordings</u>. <u>See UMG Recordings</u>, 2013 WL 1092793, at *19 (holding that the service provider did not have the "right and ability to control" infringing activity where the record demonstrated that "(a) the allegedly infringing *material* resided on [the service provider's] system; (b) [the service provider] had the ability to remove such material; (c) [the service provider] could have implemented, and did implement, filtering systems; and (d) [the service provider] could have searched for potentially infringing content."). Moreover, the mere fact that Defendants had Terms of Use, and enforced its policy by removing material and terminating users who violated those terms, does not remove Section 512(c)'s protections. <u>See Io Group</u>, 586 F. Supp. 2d at 1150-51 (rejecting a copyright holders' argument that a service provider had the "right and ability to control" infringing activity because the service provider conducted occasional "spot checks" of videos uploaded onto its website for compliance with its policies).

---

[9] Plaintiff contends that the appropriate test for determining "right and ability to control" under Section 512(c)(1)(B) is the test for common-law vicarious liability set forth in <u>Fonovisa, Inc. v. Cherry Auction, Inc.</u>, 76 F.3d 259, 262-63 (9th Cir. 1996) and <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1024 (9th Cir. 2001). The Ninth Circuit explicitly rejected this argument in <u>UMG Recordings</u>. <u>See</u> 2013 WL 1092793, at *16.

|  | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

 

**F.** **Reasonably adopted and implemented, and informed its members of a policy that provides for the termination in appropriate circumstances of members who are repeat infringers**

Finally, to be entitled to Section 512(c)'s safe harbor, Defendants must satisfy the "threshold" requirements of Section 512(i). This element can be broken down into five sub-parts:

1. The service provider must adopt a termination policy;
2. The policy must provide for termination from the service provider's system or network of subscribers and account holders who qualify as "repeat infringers";
3. The service provider must inform its subscribers and account holders about the policy;
4. The termination need only occur in "appropriate circumstances"; and,
5. The service provider must reasonably implement the policy.

17 U.S.C. § 512(i)(1)(A). Plaintiff concedes that that Motherless has adopted an adequate termination policy and informs its subscribers of it, but argues that Plaintiff has not "reasonably implemented" that policy by failing to terminate repeat infringers in "appropriate circumstances."

The "reasonable implementation" requirement of Section 512 consists of two sub-elements: "implementation" and "reasonableness." See CCBill, 488 F.3d at 1109-1110. A service provider "implements" its termination policy if it has 1) a working notification system; 2) a procedure for dealing with DMCA-compliant notifications; and 3) does not actively prevent copyright owners from collecting information needed to issue such notifications. Id. at 1109. Moreover, a service provider must have in place some system to track DMCA-complaint notices of infringement, so that a service provider can identify "repeat infringers"—that is, users who post infringing material on multiple occasions. See id. at 1110 ("[A] substantial failure to record webmasters associated with allegedly infringing websites may raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy."). As to the reasonableness prong, "[t]he [DMCA] permits service providers to implement a variety of procedures, but an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." Id. at 1109-10 (citing 17 U.S.C. § 512(i); Corbis, 351 F.Supp.2d at 1102).

Plaintiff concedes that Defendants have implemented a policy by providing a working notification system, a procedure for dealing with DMCA-complaint notifications, and does not actively prevent copyright owners from collecting information needed to issue such notifications. See Lange Decl. ¶¶ 236-271. Moreover, Plaintiff does not dispute that Defendants sufficiently track users with a

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|
| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. | | |

history in of infringing.  See Lange Decl. ¶¶ 256-257.  The gravamen of Plaintiff's charge is that Motherless has not "reasonably" implemented that policy.

In support of Defendants' contention that they have "reasonably" implemented their repeat infringer policy, Defendants submitted undisputed evidence that they have terminated between 1,300 and 2,000 users for alleged copyright infringement.  See SUF ¶¶ 269-270.  In response, Plaintiff identified nine users—the eight users who uploaded the thirty-three clips at issue in this suit, and one other user—it alleges are repeat infringers who should have been terminated, but were not.

Even assuming that Defendants should have terminated these nine users, Defendants' failure to do so does not raise a triable issue of fact as to whether Defendants failed to "reasonably implement" their termination policy.  The DMCA requires only that the policy be "reasonably"—not "perfectly"— implemented, and thus "occasional lapses are not fatal to the service provider's immunity."  3 NIMMER ON COPYRIGHT § 12B.10[D][3].  Assuming Plaintiff's best case—that Defendants identified, and terminated 1,300 repeat infringers—Defendants' failure to terminate nine of these users (or less than .01% of recognized repeat infringers) is nothing more than an "occasional lapse" in the implementation of its policy.

Moreover, Defendant was not required to terminate at least eight of the nine users identified.  As noted above, a service provider is only required to terminate a repeat infringer under "appropriate circumstances."  Although Section 512(i) "does not clarify when it is 'appropriate' for service providers to act[,]" CCBill, 488 F.3d at 1111, courts have consistently interpreted this phrase as requiring termination only when a service provider has sufficient evidence of a user's "blatant, repeat infringement of a willful and commercial nature."  Corbis, 351 F. Supp. 2d at 1104; see also CCBill, 488 F.3d at 1109 ("[I]mplementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright."); Costar Group Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 703 (D. Md. 2001) aff'd sub nom. CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544 (4th Cir. 2004) (noting that Section 512(i) "is designed so that *flagrant* repeat infringers, who '*abuse* their access to the Internet through disrespect for the intellectual property rights of others should know there is a realistic threat of losing access.'") (quoting H.R. Rep. No. 105-551, Part 2, at 61) (alteration omitted) (emphasis added).

In this case, Defendants had no evidence that three of the nine users identified by Plaintiff had uploaded infringing content prior to the filing of the instant suit.  SUF ¶¶ 287, 289, 291.[10]  By definition,

---

[10] Although Defendant had received take down notices related to content uploaded by one of these three users before the instant law suit, those notices were *not* DMCA-compliant.  A non-compliant

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

these users cannot be classified as "repeat" infringers.  Defendants did have evidence that three other users had infringed *once* before.  SUF ¶¶ 284, 285, 288.  Defendants also had evidence that one other user had infringed *twice* before.  SUF ¶ 286.  Although these four users were arguably "repeat" infringers, their infringement was in no way "blatant" or "flagrant," thus excusing Defendants' failure to terminate them.

As to the final two users (of the nine Plaintiff asserts are "repeat infringers"), Defendants only received one notice that one—BBQ69—had uploaded infringing material.  SUF ¶ 386.  Although the notice received by Defendants indicated that BBQ69 had uploaded twenty-one infringing works, a service provider's failure to terminate users who upload multiple videos that are identified in a single DMCA notice does not remove Section 512(c)'s immunity.  See UMG Recordings., 665 F. Supp. 2d at 1118 ("As to [the copyright holder's] objection that [the service provider] terminates a user only after a second warning, even if the first warning was spurred by a DMCA notice identifying multiple infringements, [the copyright holder] points to nothing in the statute, legislative history, or case law establishing that such a policy is not reasonable or appropriate."); see also Corbis, 351 F. Supp. 2d at 1100-01 ("[T]he key term, repeat infringer, is not defined . . . . The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined.").

Finally, Defendants received four DMCA-complaint notices related to content uploaded by the last user, Kristy7187, between February 8, 2011 and August 9, 2012.  SUF ¶ 290.  However, Defendants terminated Kristy 7187 in August of 2012.  Id.  Although Defendants perhaps should have terminated her earlier, their isolated failure to do so does not evidence a failure to "reasonably implement" their repeat infringer termination policy.[11]

---

notice may *not* be used as evidence that a service provider knew of, and tolerated, a users' repeated copyright infringement.  See CCBill, 488 F.3d at 1113.

[11] Indeed, whether Kristy7187 should have been terminated is debatable.  As a leading treatise has observed, "Courts have taken an *ad hoc* approach to deciding what makes an infringer a 'repeat' infringer, weighing both the number of infringements and the period of time that separates them."  2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 8.3.2 (2012) (citing Viacom Int'l Inc. v. YouTube, Inc., 718 F. Supp. 2d 514, 527 (S.D.N.Y. 2010) aff'd in part, vacated in part, remanded, 676 F.3d 19 (2d Cir. 2012) (holding that a service provider had reasonably implemented its repeat infringer termination policy where a user was only removed after receiving *three separate* DMCA-complaint infringement notices)).

                                          :

Initials of Preparer            PMC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|----------|----------------------|------|--------------|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|-------|---------------------------------------------------|

Plaintiff points to one other item of evidence in support of its assertion that Defendants did not reasonably implement their repeat infringer policy. In the termination notice Lange sent to Kristy7187, Lange stated that "[t]he DMCA law clearly says we have to terminate repeat offenders. Your past DMCA notices have been spread out over some time, and based off of the amount of files you had, it wasn't a problem." SUF ¶ 393. This notice might support the inference that Defendants *regularly* tolerate repeated, blatant copyright infringement by users so long as the instances of infringement are sufficiently spread out and the amount of material uploaded is sufficiently voluminous. Yet the evidence fails to demonstrate that this is the case. Out of more than 700,000 users who have been active over the site since its inception, Plaintiff has identified only one—Kristy 7187—who was arguably allowed to remain on Defendants' system despite evidence that she or he repeatedly and blatantly uploaded infringing activity. Indeed, Plaintiff failed to so much as ask Lange about the e-mail he sent to Kristy7187 during Lange's deposition, much less ask him whether he similarly allowed other users to remain active on Motherless.com once he had evidence that they repeatedly, blatantly uploaded copyrighted material. This one episode cannot create a genuine issue of material fact as to whether Defendants' "reasonably implemented" their repeat infringer termination policy in light of the undisputed record of compliance described above. As Nimmer has observed, the DMCA requires only that the policy be "reasonably"—not "perfectly"—implemented, and thus "[an] occasional lapse[ is] not fatal to the service provider's immunity." 3 NIMMER ON COPYRIGHT § 12B.10[D][3].

### VI. REMEDY

Thus, for the reasons discussed above, the Court concludes that, as a matter of law, Defendants are entitled to Section 512(c)'s safe harbor. Plaintiff's remedy is therefore "limited injunctive relief set forth in 17 U.S.C. § 512(j)." Corbis, 351 F. Supp. 2d at 1099. Section 512(j) permits a district court to issue an order "restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system," or "restraining the service provider from providing access to a subscriber or account holder who is engaging in infringing activity . . . by terminating the accounts of the subscriber or account holder[.]" 17 U.S.C. § 512(j). However, Defendants have already removed the thirty three infringing clips at issue in this case; thus, Plaintiff's request for injunctive relief is moot. See Io Group, 586 F. Supp. 2d at 1154-55 ("In this case, before it ever received notice of any claimed infringement, [the service provider] independently removed all adult content, including video files of plaintiff's works . . . . Thus, any injunctive relief to which [the copyright holder] would be entitled [under Section 512(j)] is moot.").

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

### VII.    CONCLUSION

For the reasons put forward in this Order, the Court GRANTS Defendants' motion for partial summary judgment as to Plaintiff's copyright claims, and DISMISESS those claims WITH PREJUDICE.

As to Plaintiff's remaining state law cause of action, in its Complaint, Plaintiff asserted that this Court had supplemental jurisdiction over that claim under 28 U.S.C. § 1367.  Section 1367 confers federal courts with jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367.  "A state law claim is part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together."  Bahrampour v. Lampert, 356 F.3d 969, 978 (9th Cir. 2004).

Plaintiff's state law claim asserts violations of California Business and Professions Code § 17200.  Section 17200, also known as California's Unfair Competition Law ("UCL"), "allows individual plaintiffs to bring claims for unfair, unlawful, or fraudulent business practices."  Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 717 (9th Cir. 2012).  "To be 'unlawful' under the UCL, the [alleged business practice] must violate another 'borrowed' law."  Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012); see also Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) ("[S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.") (internal quotation marks omitted).  "Virtually any state, federal or local law can serve as the predicate for an action under section 17200."  Davis, 691 F.3d at 1168 (internal citations, quotation marks, and alteration omitted).

In its complaint, Plaintiff alleged that Defendant has violated 18 U.S.C. § 2257.[12]  Section 2257 is part of Congress' "comprehensive statutory scheme to eradicate sexual exploitation of children."  United States v. Thomas, 893 F.2d 1066, 1068 (9th Cir. 1990).  The statute requires any person who produces sexually explicit conduct to "create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction."  18 U.S.C. § 2257(a).  Those records must document each performer's "name and date of birth, and require the performer to provide such other

---

[12] Although Section 2257 is a federal statute, it does not create a private right of action.  See Bullard v. MRA Holding, LLC, 890 F. Supp. 2d 1323, 1330 (N.D. Ga. 2012) ("Congress did not create a private right of action for a violation of 18 U.S.C. § 2257.").

|  |  | : |  |
|---|---|---|---|
|  | Initials of Preparer |  | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-5912-SVW-FMO | Date | July 3, 2013 |
|---|---|---|---|

| Title | Ventura Content, Ltd. v. Motherless, Inc. et al. |
|---|---|

indicia of his or her identity." 18 U.S.C. § 2257(b). In its complaint, Plaintiff alleges that Defendants are required to, and do not, keep the records required by Section 2257.

These allegations do not share a "common nucleus of operative fact" with Plaintiff's copyright claims. Defendants' failure to keep records has little, if anything, to do with the copyrighted material that appeared on their system. Thus, the Court declines to exercise supplemental jurisdiction over these claims.

However, the Court recognizes that Plaintiff may have an alternative basis for liability— diversity jurisdiction. From the face of the complaint, it appears that there is complete diversity between the parties. However, Plaintiff does not allege an amount in controversy as to its Section 17200 claim. Thus, if Plaintiff wishes to pursue its state-law claim in this Court, the Court ORDERS Plaintiff to file a notice with this court within twenty days of the date of this Order demonstrating that the amount-in-controversy requirement is met as to this claim. Failure to do so will result in dismissal of Plaintiff's claim WITHOUT prejudice.

:

Initials of Preparer                    PMC